UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| ARCH WOOD PROTECTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:10-CV-282 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| FLAMEDXX, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## M E M O R A N D U M

Before the Court is Counter-Defendant Arch Wood Protection, Inc.'s ("Defendant") motion to dismiss Counter-Plaintiff Flammedxx's ("Plaintiff") amended counterclaim ("counterclaim") (Court File No. 66).[1] Defendant argues Plaintiff's counterclaim fails to state a claim on which relief can be granted because Defendant was not obligated to perform the duties serving as the basis of Plaintiff's claims and Plaintiff has failed to allege damages. Plaintiff responded in opposition to Defendant's motion (Court File No. 68), arguing its factual allegations are sufficient to survive Defendant's motion to dismiss. Defendant replied to Plaintiff's response (Court File No. 69). For the following reasons, the Court will **GRANT IN PART** and will **DENY IN PART** Defendant's motion (Court File No. 66).

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is a Tennessee limited liability company that produces a fire-retardant substance used to coat oriented strand board ("OSB"), which is a wood product used in the construction

---

[1] Defendant originally filed a motion to dismiss on November 7, 2012. On November 28, 2012, Plaintiff amended its answer and counterclaim. Defendant subsequently filed the instant motion on December 28, 2012. Accordingly, Defendant's original motion to dismiss will be **DENIED** as **MOOT** (Court File No. 62).

industry. Plaintiff produces the substance and applies the coating. Defendant supplies OSB to customers in the construction industry. In February 2009, the parties began discussing the creation of a business relationship, and executed a confidentiality agreement in order to protect proprietary information during these discussions (Court File No. 64-1). The discussions proved successful, and on May 14, 2009, the parties entered into an "Exclusive Production Services and Distribution Agreement" ("the Contract") a redacted version of which was attached to Defendant's complaint (Court File No. 7-1). An unredacted version of the Contract was also provided to the Court, but filed as a separate document (Court File No. 3).

Under the Contract, Plaintiff agreed to produce coated OSB for Defendant. Plaintiff agreed that, during the relationship under contract, it would not sell the product to Defendant's customers, providing Defendant semi-exclusive sale rights over the product. Plaintiff also agreed not to produce, authorize, or assist others to produce a similar product for sale in North America, and would forward all leads and potential customers to Defendant. Plaintiff did, however, reserve the right to sell its product to certain specifically identified customers. Additionally, if Defendant failed to purchase an amount specified in the "Threshold Service Level," which required minimum-quantity purchases during certain time periods, Defendant could cancel its obligations with thirty-days notice. However, these threshold levels were only applicable if Plaintiff satisfied the "Product Certification Requirement." Pursuant to this provision, Plaintiff was required to obtain evaluation reports by IAMPO Evaluation Service LLC ("IAMPO") and ICC Evaluation Service, Inc. ("ICC"). If this requirement was not met, the threshold level would be zero until Plaintiff satisfied the requirement. If Plaintiff satisfied the requirement during one of the listed periods, the threshold levels would be prorated to the date Plaintiff obtained the evaluations.

Plaintiff successfully satisfied the IAMPO requirement. As a result, and pursuant to the Contract, Defendant paid Plaintiff a deposit. In July 2009, Defendant and its customers began delivering OSB to Plaintiff for coating in compliance with the Contract. Subsequently, Plaintiff sought an evaluation by ICC. However, ICC informed Plaintiff it did not have "acceptance criteria or guidelines" that applied to Plaintiff's product, and as a result Plaintiff was unable to obtain an ICC report. Plaintiff alleges Defendant was aware ICC had no such evaluation, both before and after execution of the Contract, but entered the agreement fraudulently. During this time period, Defendant and its customers continued to send OSB to Plaintiff for coating. Defendant also marketed its product as protected by Plaintiff's coating. Sometime during this period, Defendant offered to purchase Plaintiff, but Plaintiff refused to sell.

During the twelve months following execution of the Contract, Defendant did not satisfy the threshold levels. Accordingly, and pursuant to the Contract, Plaintiff informed Defendant it was canceling its obligations. Plaintiff later discovered Defendant disclosed confidential information, including proprietary information about Plaintiff's product and results of tests performed on Plaintiff's product, to OSMOSE Holdings, Inc., a competitor of Plaintiff's. Plaintiff also alleges Defendant has failed to return confidential information and items, including samples of its product. Plaintiff believes Defendant is attempting to reverse engineer its product, and has revealed more confidential information to Hoover Treated Wood Products, Inc., another of Plaintiff's competitors.

In October 2010, Defendant filed a complaint against Plaintiff alleging breach of contract. The complaint relates to Plaintiff's refusal to return Defendant's deposit, and Plaintiff's refusal to reimburse Defendant for product in Plaintiff's possession that was damaged as a result of flooding. Defendant also alleged Plaintiff removed product against Defendant's instruction to a third-party facility, who then refused to release the product unless substantial storage fees were paid. After

Defendant's complaint was filed, Plaintiff failed to respond and the Clerk of Court entered default. Before default judgment was entered, Plaintiff moved to set aside the Clerk's entry of default. The Court granted that motion, and awarded Defendant attorney's fees incurred in obtaining service, entry of default, and in opposing Plaintiff's motion to set it aside.

Plaintiff then filed its answer, and included a counterclaim against Defendant. Plaintiff alleges promissory fraud, breach of contract, breach of the confidentiality agreement, and a violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-101, *et seq.* Plaintiff's promissory fraud claim is based on its allegation Defendant knew ICC had no applicable evaluation and entered into the contract without intent to comply with the threshold levels so that it would receive Plaintiff's product at a reduced rate. Plaintiff also argues Defendant never intended to comply with the confidentiality agreement, and so committed promissory fraud when executing that agreement as well. Plaintiff's breach of contract claim relates to Defendant's failure to comply with the threshold levels. Plaintiff's breach of confidentiality agreement claim alleges Defendant divulged proprietary information to two of Plaintiff's competitors. Finally, Plaintiff's TCPA claim alleges Defendant's deceitful actions constitute unfair and deceptive trade practices. Defendant filed the instant motion seeking dismissal of all four claims.

## II.    STANDARD OF REVIEW

A Rule 12(b)(6) motion should be granted when it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998). For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint. *Thurman v. Pfizer*, *Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). The Court may, however, consider documents attached to the complaint, documents

included by reference in the complaint, and documents referred to in the complaint that are central to the plaintiff's claim. *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999). Accordingly, the Court in this case may consider, and will consider, the Contract and the confidentiality agreement. Although the complaint's factual allegations are accepted as true, deference does not extend to bare assertions of legal conclusions, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. Although a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)), this statement must nevertheless contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility as explained by the Court "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III.   DISCUSSION

Plaintiff asserts four claims: promissory fraud, breach of contract, breach of the confidentiality agreement, and a violation of the TCPA. The Court will consider each claim in turn.

**A. Promissory Fraud**[2]

Plaintiff argues Defendant made representations during contract negotiations that it would abide by the threshold service levels. It then entered into the Contract knowing ICC had no criteria on which it could evaluate Plaintiff's product, and had no intent to abide by the threshold levels in the Contract. Moreover, Plaintiff argues, Defendant had no intent to abide by the confidentiality agreement, but planned to disclose confidential and proprietary information from the outset of the parties' discussions. Defendant, on the other hand, argues it did not misrepresent its intention to perform because the Contract contains no obligation to abide by the threshold levels, and even if it did, the threshold levels were inapplicable if Plaintiff failed to obtain the ICC evaluation. Defendant does not respond to Plaintiff's argument regarding the confidentiality agreement.

"To prevail on a claim of promissory fraud, the plaintiff must establish '(1) an intentional misrepresentation of a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) an injury caused by reasonable reliance on the statement; and (4) a promise of future action with no present intent to perform.'" *Roopchan v. ADT Sec. Sys., Inc.*, 781 F. Supp. 2d 636, 653 (E.D. Tenn. 2011) (quoting *Houghland v. Houghland*, No. M2005–01770–COA–R3–CV, 2006 WL 2080078, at *3 (Tenn. Ct. App. July 26, 2006)). In

---

[2] As has been frequently noted, for some time Tennessee refused to recognize an action in promissory fraud. *See Farmers & Merchants Bank v. Petty*, 664 S.W.2d 77, 80 (Tenn. Ct. App. 1983) (quoting *Fowler v. Happy Goodman Family*, 575 S.W.2d 496 (Tenn. 1978)). However, the Tennessee Supreme Court, in the mid-twentieth century, acknowledged a willingness to consider a promissory fraud action in the right circumstances. *Fowler*, 575 S.W.2d at 499 ("[T]his Court indicated that it would be willing to consider adopting the rule followed in a majority of jurisdictions with respect to the subject 'in a proper case where justice demands . . . .'") (quoting *Bolan v. Caballero*, 417 S.W.2d 538, 541 (Tenn. 1967)). Lower courts have since considered promissory fraud actions, *see, e.g.*, *Carter v. Patrick*, 163 S.W.3d 69 (Tenn. Ct. App. 2004), and the Sixth Circuit has recognized the validity of a promissory fraud action under Tennessee law, *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 567 (6th Cir. 2003).

promissory fraud cases, the misrepresentation itself is the promise of a future action without present intent to perform.[3] *See Carter v. Patrick*, 163 S.W.3d 69, 77 (Tenn. Ct. App. 2004) (listing the elements of fraud relied upon by *Houghland* but clarifying "if the claim is based on promissory fraud, then the misrepresentation must embody a promise of future action without the present intention to carry out the promise") (internal quotations omitted). Where, as here, a party alleges a fraudulent misrepresentation to induce a party to enter a contract, the parole evidence rule[4] does not apply "because under Tennessee law, promissory fraud sounds in tort, not in contract." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 567 (6th Cir. 2003). The Sixth Circuit has recognized "Tennessee law 'does not require ambiguity when certain defects in the formation of the agreement

---

[3] Indeed, some courts have listed the elements of promissory fraud as follows: "(1) a promise of future conduct, (2) that was material, (3) made with the intent not to perform, (4) that plaintiff reasonably relied upon, and (5) to plaintiff's injury." *Regions Bank v. SoFHA Real Estate, Inc.*, No. 2:09–CV–57, 2010 WL 3341869, at *5 (E.D. Tenn. Aug. 25, 2010) (quoting *Noblin v. Christiansen*, No. M2005-01316-COA-R3-CV, 2007 WL 1574273, at *9 (Tenn. Ct. App. 2007)). Some courts have stated the inquiry more bluntly: "[Tennessee] recognize[s] promissory fraud, that is entering into contract with no present intent to perform." *Taylor v. UnumProvident Corp.*, No. 1:03–cv–1009, 2008 WL 4415601, at *3 (E.D. Tenn. Sept. 24, 2008); *see also Fowler*, 575 S.W.2d at 499 ("Under the majority view, in order for actionable fraud to be based upon a promise of future conduct, it must be established that such a promise or representation was made with the intent not to perform. A statement of intention must be false and the intention not actually held."); *Kandel v. Ctr. for Urological Treatment & Research*, No. M2000-02128-COA-R3-CV, 2002 WL 598567, at *8 (Tenn. Ct. App. Apr. 17, 2002) ("To establish a claim for promissory fraud, a claimant must show that, at the time the promise was made, the person making the promise had no intention to perform."). The Court concludes, on its understanding, there is no substantive distinction between these various explanations of the tort.

[4] The Court notes the Sixth Circuit, in *Academic Imaging, LLC v. Soterion Corp.*, 352 F. App'x 59, 66 (6th Cir. 2009), distinguished between fraudulent inducement, to which the parol evidence rule is inapplicable, and promissory fraud, to which it is applicable. However, *Academic Imaging* analyzed the application of the parol evidence rule in Ohio law. *Shah* explicitly stated the parol evidence rule was inapplicable under Tennessee law in the promissory fraud context, and subsequent courts have applied that holding. *See, e.g.*, *Nat'l Fitness Ctr., Inc. v. Atlanta Fitness, Inc.*, – F. Supp. 2d –, No. 3:09–cv–133, 2012 WL 4829462, at *9 n.9 (E.D. Tenn. Oct. 10, 2012); *Home Bank of Tenn. v. Beams*, No. 3:06-cv-191, 2007 WL 3287297, at *3 (E.D. Tenn. Nov. 5, 2007).

are demonstrated; parol evidence can be admitted to contradict or vary the terms or enlarge or diminish the obligation of a written instrument upon a showing of fraud.'" *Id.* (quoting *Cincinnati Insurance Co. v. Avery*, No. 89–5536, 1990 WL 132245, at *3 (6th Cir. Sept. 12, 1990) (unpublished)).

With respect to Plaintiff's promissory fraud claim pursuant to the Contract, the Court concludes Defendant misreads the counterclaim. Defendant is correct that the Contract itself does not obligate it to abide by the threshold levels. Rather, the Contract predicates Plaintiff's obligation to perform on Defendant's compliance with the threshold levels, and authorizes Plaintiff to cancel the Contract if Defendant does not so comply. However, the counterclaim does not base the alleged fraudulent statement on the language of the Contract. The complaint states "[i]n negotiating the Contract with [Plaintiff] in the spring of 2009, [Defendant] represented that it would satisfy the Threshold Service Level" (Court File No. 64, ¶ 36). Plaintiff alleges Defendant did so knowing the ICC requirement could not be satisfied, which would render the threshold levels inapplicable and therefore obligate Plaintiff to abide by the Contract without obligating Defendant to utilize Plaintiff's services at the threshold levels. Plaintiff alleges Defendant made this representation without present intent to perform this promise made separately from the Contract; that is, without present intent to abide by the threshold levels.

The Court concludes Plaintiff has sufficiently pleaded a misrepresentation. Contrary to Defendant's argument, the alleged misrepresentation was not a promise in the terms of the Contract. The alleged misrepresentation was Defendant's statement made during contract negotiations that it would abide by the threshold service levels. Such a misrepresentation is sufficient under Tennessee law to state a promissory fraud claim. *See Shah*, 338 F.3d at 567 (holding assurances

made by a party that it would not use a termination clause for anything other than poor performance "established a triable case under Tennessee law").

Defendant also argues the suggestion it knew ICC had no applicable evaluation criteria is absurd because Plaintiff "is a sophisticated business entity that conducted arms-length negotiations with [Defendant]." Further, even if Defendant was aware ICC could not evaluate Plaintiff's product, Plaintiff had an independent responsibility to determine the feasability of an ICC evaluation, rendering any reliance on Defendant's misrepresentation unreasonable. However, "[u]nder Tennessee law, reasonable reliance is a question of fact for the jury to decide." *Riggs Drug Co., Inc. v. Amerisourcebergen Drug Corp.*, No. 3:09–CV–538, 2010 WL 3619951, at *5 (E.D. Tenn. Sept. 13, 2010) (citing *Corso Enters., Inc. v. Shop at Home Network, Inc.*, No. 3:04–0260, 2005 WL 2346986, at *8 (M.D. Tenn. Sept. 26, 2005) (holding reasonable reliance in the promissory fraud context is a jury question)). Accordingly, because Plaintiff has pleaded the other elements of promissory fraud, "it is not for the Court to determine [reasonable reliance] at this time." *Id.*[5]

Finally, with respect to promissory fraud pursuant to the Contract, Defendant argues the allegations in Plaintiff's counterclaim belie its claim: In addition to alleging Defendant never intended to perform under the Contract, the counterclaim alleges Defendant and its customers continued to deliver OSB to Plaintiff's facility for coating. However, Plaintiff's allegation is Defendant never intended to satisfy the threshold levels, not that Defendant never intended to

_____

[5] Defendant does not reference it in its motion, but the Contract contained an integration clause stating the Contract is the entire understanding between the parties and supersedes all contemporaneous oral and written negotiations and agreements. However, although integration clauses are relevant in the reasonable reliance context, "nothing suggests the Tennessee judiciary has either adopted or would adopt a *per se* rule that an integration clause makes it *always* unreasonable to rely on prior oral representations." *Shah*, 338 F.3d at 568 (emphasis in original). Because reasonable reliance is typically a question for a jury, *Riggs Drug*, 2010 WL 3619951, at *5, the Court will not grant Defendant's motion on the basis of the integration clause.

purchase services from Plaintiff at all. Plaintiff specifically alleges Defendant "did not come close to satisfying the Threshold Service Level" and otherwise repeatedly alleges the threshold levels were not met (Court File No. 64, ¶ 30). Defendant's argument is without merit.

Defendant does not respond directly to the counterclaim's allegation Defendant committed promissory fraud when it entered into the confidentiality agreement. The counterclaim alleges Defendant made representations in negotiations for the confidentiality agreement that it would not divulge to third parties information it obtained in the discussions. The counterclaim alleges Defendant made this promise of future conduct without present intent to perform, Plaintiff relied on this representation when disclosing proprietary information to Defendant, and Plaintiff suffered damage to its business as a result of Defendant's misrepresentation. The Court concludes these allegations are sufficient to withstand Defendant's motion to dismiss.

Regarding both the Contract and the confidentiality agreement, Defendant argues Plaintiff attempts to claim tortious breach of contract, which is not a cognizable cause of action in Tennessee. However, Plaintiff here is not claiming a tortious breach. Such attempted claims often arise when a party seeks compensation for an intentional breach of contract. Because the action is "rooted in the performance of the agreement's terms," a plaintiff will be held to contractual remedies. *Fifth Third Leasing Co. v. Cherokee Pontiac, Buick, Olds, GMC Trucks, LLC*, No. E2001-01628-COA-R3-CV, 2002 WL 407224, at *2 (Tenn. Ct. App. Mar. 13, 2002). Here, on the other hand, Plaintiff is making a separate claim of fraud in addition to claiming Defendant breached their agreements. This claim arises from conduct during the negotiations and separate from the agreement. Such alternate theories are acceptable in Tennessee. "Alternate theories of recovery are barred only where the remedies sought are 'truly repugnant to one another,' but a claim for misrepresentation is not repugnant to a claim for breach of contract, nor are the 'theories of breach

10

of contract and fraud . . . repugnant or antagonistic to each other.'" *Tenn. Educ. Lottery Corp. v. Smartplay Intern., Inc.*, No. 3:08–1058, 2010 WL 4659216, at \*9 (M.D. Tenn. Nov. 9, 2010) (quoting *Allied Sound, Inc. v. Neely*, 909 S.W.2d 815, 822 (Tenn. Ct. App. 1995)); *see also Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 238 (Tenn. Ct. App. 1998) ("Plaintiff is entitled, however, to recover damages incurred during the period of his employment as a result of promissory fraud if he can show that he incurred damages beyond those awarded for breach of contract."). Therefore, Defendant's tortious breach argument lacks merit.

For these reasons, the Court will **DENY** Defendant's motion to dismiss Count One.

### B. Breach of Contract

Plaintiff alleges Defendant breached the Contract when it failed to abide by the threshold service levels. Defendant argues it was not obligated to abide by those threshold levels, and if it was, the threshold level was zero because Plaintiff failed to obtain an ICC evaluation. Plaintiff responds the ICC evaluation was impossible to obtain, and its obligation to do so under the Contract was therefore void, rendering the threshold levels applicable.

The Court agrees with Defendant. To establish a breach of contract, a plaintiff must show "1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract." *Nw. Tenn. Motorsports Park, LLC v. Tenn. Asphalt Co.*, – S.W.3d –, 2011 WL 4416561, at \*5 (Tenn. Ct. App. Sept. 23, 2011) (internal quotation marks omitted). The interpretation of a contract is a legal issue for the Court. *First Am. Nat'l Bank v. Fidelity & Deposit Co. of Md.*, 5 F.3d 982, 984 (6th Cir. 1993).

The Contract in this case did not obligate Defendant to purchase at the threshold levels. Rather, as noted above, the Contract required Plaintiff to perform semi-exclusive services for Defendant assuming Defendant abided by the threshold levels. If Defendant did not abide by those

levels, Plaintiff was entitled to cancel its obligations in writing, providing Defendant an opportunity to subsequently satisfy the threshold level within thirty days (Court File No. 3, Unredacted Contract, § 2.2).[6] Defendant never promised to purchase product at the threshold levels; Defendant promised to, among other things, refrain from selling any competitor's fire-retardant OSB unless Plaintiff canceled its obligations pursuant to the Contract.[7] There is no allegation in the counterclaim that Defendant sold or marketed another company's product before Plaintiff canceled its obligation. Because Defendant was not obligated to meet the threshold levels, its failure to do so could not constitute nonperformance amounting to a breach.

---

[6] "If AWP fails, during any period listed in Part 2 of Schedule 1, to place orders to purchase in the aggregate at least the Threshold Service Level for such period (otherwise than as a result of FlameDXX's failure to comply with its obligations hereunder), FlameDXX may on 30 days' written notice to AWP cancel FlameDXX's obligations under this Section 2.2; <u>provided</u>, however, that such cancellation shall not be effective if, within such 30-day notice period, AWP places additional orders for Services that, when aggregated with orders placed during the relevant period, meet the applicable Threshold Service Level for such period. Such cancellation notice must be given by FlameDXX, if at all, within ninety (90) days following the end of the relevant period."

[7] "**AWP OBLIGATIONS**
4.1     AWP shall:-
4.1.1   promote the Products in the Market in such manner as may be determined by AWP from time to time in its sole discretion;
4.1.2   provide FlameDXX with a summary of its initial launch plans for distribution of the Product;
4.1.3   15 days prior to the beginning of each calendar quarter, supply FlameDXX with a non-binding forecast of AWP's anticipated orders for Services hereunder during such calendar quarter;
4.1.4   provide technical support and service to the customers of AWP and its designees, including advice on Product use, handling and safety precautions, equipment specifications and Product application techniques; and
4.1.5   refer to FlameDXX all complaints regarding the Product for response and handling.
4.2     AWP shall not make any statements or representations in relation to the Products which, to its knowledge, are untrue.
4.3     For so long as FlamDXX remains bound by and complies with FlameDXX's obligations under Section 2.2 above and has not given a notice of cancellation with respect to such obligations, AWP shall refrain from marketing, selling or distributing in the Market any fire retardant coated oriented strand board other than the Product."

In response to this issue, Plaintiff makes two arguments. Plaintiff's first argument is the language of the Contract does in fact establish the threshold levels as an obligation. Plaintiff suggests the levels specifically provided in Part 2 of Schedule 1, as well as the obligations in Section 2.2, demonstrate the amount Defendant was required to purchase. Simply because Plaintiff was entitled to terminate the Contract, Plaintiff argues, did not render its common law contractual remedies inapplicable. In fact, the Contract itself states "[t]he expiration, cancellation or termination of this Agreement, for whatever reason . . . will not relieve any party that has breached this Agreement from liability for damages resulting from such breach" (Court File No. 7-A, Redacted Contract, ¶ 9.6).

This argument is unconvincing. The provision of the Contract maintaining common law remedies in case of breach is still predicated on an actual breach, which itself requires nonperformance of an obligation under the Contract. Plaintiff has identified no provision of the Contract that imposed upon Defendant the obligation to purchase at the threshold levels. Section 2.2, identified by Plaintiff as a possible source of Defendant's alleged purchase obligation, imposes obligations on *Plaintiff* not Defendant (*see id.* § 9.4.3) ("[A party may cancel the Contract if t]he other party breaches its obligations under Section 2.2 (*in the case of FlameDXX*) or Section 4.3 (*in the case of AWP*).") (emphasis added). Part 2 of Schedule 1, which contains the threshold levels, also does not contain any language imposing an obligation. Rather, Defendant's obligations under the Contract are listed primarily in Section 4. No provision of Section 4 imposes an affirmative purchase obligation on Defendant (*see supra* note 6). Accordingly, Defendant breached no such obligation when it failed to purchase at the threshold level.

Plaintiff's second argument is broader: The exclusive purchase agreement was Plaintiff's chief benefit under the Contract. Plaintiff sold at a discounted rate in exchange for guaranteed

13

purchase amounts and a monopoly on Defendant's fire-retardant needs. If Defendant was not required to make the actual purchases, Plaintiff argues, why would Plaintiff have engaged in the relationship at all? To read the Contract in such a way conflicts with the parties' clear intent. The Court does not agree. The fact Defendant was not obligated to purchase at the threshold level is why Plaintiff was conferred authority to cancel its own obligations if Defendant failed to purchase at those levels. Section 9.4.3 provides the parties the authority to cancel the Contract when the other party breaches its obligations under the relevant sections imposing obligations on each party. Because Section 4 of the Contract does not impose an affirmative purchase obligation on Defendant, it was necessary for the parties to provide an independent basis for Plaintiff to terminate its obligations if Defendant failed to purchase at the agreed levels. This authority ensured Plaintiff's concern would be addressed; if Plaintiff was not provided its chief benefit—guaranteed business—it would not, in turn, be required to act to its detriment by continued compliance with exclusivity or pricing requirements.

For these reasons, the Court will **GRANT** Defendant's motion to dismiss Count Two.

## C. Breach of the Confidentiality Agreement

Defendant argues Plaintiff's breach of the confidentiality agreement claim should be dismissed as well. Defendant's primary argument is ¶ 6 of the agreement limits liability for breaches of the agreement, and accordingly Plaintiff has not pleaded the required element of damages. *See Nw. Tenn. Motorsports Park*, 2011 WL 4416561, at *5 (noting a breach of contract requires "damages caused by the breached contract"). Paragraph 6 provides,

> Neither party is responsible or liable for any business decisions made or inferences drawn by the other party in reliance on this Agreement or in reliance on actions taken or disclosures made pursuant to this Agreement. Neither party makes any warranty, express or implied, with respect to the Information. Neither party shall be liable to the other hereunder for amounts representing loss of profits, loss of business, or

indirect, consequential or punitive damages of the other party in connection with the provision or use of the Information hereunder.

(Court File No. 64-1, ¶ 6).  Paragraph 9 speaks to the issue of remedies as well:

The parties acknowledge that in the event of an unauthorized disclosure of the Information by the Receiving Party, the damages incurred by the Disclosing party may be difficult if not impossible to ascertain, and that such Disclosing party may seek injunctive relief as well as monetary damages against a party that breaches this Agreement.

(*id.*, ¶ 9).  Defendant stresses the limitation on liability for "loss of profits, loss of business, or indirect, consequential or punitive damages" in the agreement and concludes Plaintiff's damages alleged in the complaint are thus unattainable.

The Court disagrees with Defendant's interpretation of the agreement.  Given the context of the limitation on damages in ¶ 6, the Court concludes the limitation applies not to *breaches* of the agreement but to "business decisions made or inferences drawn by the other party in reliance on th[e] Agreement or in reliance on actions taken or disclosure made pursuant to th[e] Agreement." The limitation in ¶ 6 would prevent Plaintiff from seeking lost profits if, according to confidential information disclosed by Defendant in discussions, it altered its position to its detriment.  Defendant would have been similarly denied damages for loss of benefits if Plaintiff had disclosed information, such as the results of fire testing, on which Defendant then acted in reliance.  Paragraph 6 does not, as Defendant now argues, apply to damages for breach of the actual confidentiality agreement itself. Indeed, the most natural means of reading the final sentence, "[n]either party shall be liable to the other hereunder for . . . damages *of the other party* in connection with the provision or use of the Information hereunder" (emphasis added), suggests the limitation on damages only applies when the party seeking damages is the party who used the information.  In this case, Plaintiff is seeking damages for *Defendant*'s use of the information.

15

Moreover, the Court must read the confidentiality agreement as a whole. *See Adkins v. Bluegrass Estates, Inc.*, 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011) ("The interpretation of an agreement is not dependent on any single provision, but upon the entire body of the contract and the legal effect of it as a whole.") (internal quotation marks omitted). Paragraph 9 clearly contemplates the availability of damages in the event of a breach of the agreement. Although Defendant concedes ¶ 9 must be read in conjunction with ¶ 6, Defendant argues the damages discussed in the former must be circumscribed by the latter. However, ¶ 6 eliminates the possibility of essentially all forms of monetary damages, directly conflicting with the language of ¶ 9 were the Court to adopt Defendant's interpretation. The Court concludes, given the context of the whole of ¶ 6 as well as the contemplation of monetary damages in ¶ 9, the limitation provision is inapplicable to this situation.

In the alternative, Defendant moves the Court to strike ¶¶ 55 and 56 of the counterclaim because they do not state breaches of the agreement. Paragraph 55 accuses Defendant of attempting to reverse engineer Plaintiff's product. Defendant argues this paragraph should be stricken because reverse engineering was not prohibited by the confidentiality agreement and could therefore not be a breach of the agreement. However, ¶ 55 discusses the reverse engineering of Plaintiff's product in the context of misusing the disclosed confidential or proprietary information (Court File No. 64, ¶ 55) ("Arch Wood also attempted to reverse engineer Flamedxx's fire-retardant coating without Flamedxx's permission, and therefore did not use confidential information and items provided by Flamedxx in a manner contemplated by the Confidentiality Agreement."). Paragraph 3 of the agreement requires the "Receiving Party" of any proprietary or confidential information disclosed

pursuant to the agreement to "use the Information only in connection with the Subject Matter[8] and continuing correspondence and discussions by the parties pertaining thereto" (Court File No. 64-1, Confidentiality Agreement). Paragraph 55 of the counterclaim alleges Defendant misused confidential information obtained on the basis of the agreement. Accordingly, ¶ 55 does allege an actionable violation of the agreement, and the Court will not strike it.

Paragraph 56 alleges Defendant failed to return samples of Plaintiff's product. Presumably this allegation refers to ¶ 4 of the agreement, which states "[u]pon termination of discussions regarding the Subject Matter, at Disclosing Party's request, the Receiving Party shall return to the Disclosing Party or destroy all Information received in a tangible form; provided Receiving Party may maintain one archive copy of such Information to facilitate compliance with its obligations hereunder" (*id.*). Defendant argues this ¶ 56 should be stricken because Plaintiff does not allege it requested return of the samples.

Although Fed. R. Civ. P. 9(c) states "it suffices to allege generally that all conditions precedent have occurred or been performed" in pleadings, some courts have held neither Rule 9(c) nor Rule 8(a)(2) requires pleading conditions precedent. *See Kiernan v. Zurich Cos.*, 150 F.3d 1120, 1123-24 (9th Cir. 1998) ("Rule 9(c) does not expressly require that performance of conditions be pled, it merely sets forth the manner in which such pleadings should be made.") (quoting 2 James Wm. Moore, *Moore's Federal Practice*, § 9.04[1] (3d ed. 1997) ("Neither Rule 9(c) nor Rule 8(a)(2) expressly requires that the performance or occurrence of conditions precedent be pled at all by a claimant.")). The general rule, however, appears to be such conditions should in fact be pleaded.

---

[8] The "Subject Matter" of the agreement was the "discussions and negotiations between the parties regarding the one or more proposed transactions or business relations between the parties" (Court File No. 64-1, ¶ 1).

*See Ginsburg v. Ins. Co. of N. Am.*, 427 F.2d 1318, 1321-22 (6th Cir. 1970) (holding general averments of the occurrence or performance of conditions precedent are sufficient). However, where a condition precedent has not been alleged, a district court is within its discretion to allow an amendment to the complaint, which would provide a plaintiff the opportunity to rectify the omission. *See Redfield v. Cont'l Cas. Corp.*, 818 F.2d 596, 610 (7th Cir. 1987) ("[O]n remand the district court should grant plaintiff leave to amend his complaint to comply with Rule 9(c), either alleging performance of all conditions precedent generally or providing an excuse for his failure to perform."); *Maguire v. Fed. Crop Ins. Corp.*, 181 F.2d 320, 322 (5th Cir. 1950) ("If [a motion to dismiss] had been made and sustained, the defect was subject to amendment, which should now be made in advance of another trial."). The Court will provide Plaintiff the opportunity to amend ¶ 56 of its counterclaim to allege satisfaction of the condition precedent, if such condition was satisfied, or excuse for nonperformance.

Accordingly, the Court will **GRANT IN PART** and will **DENY IN PART** Defendant's motion to dismiss Count Three. The Court will deny Defendant's motion to dismiss the count and to strike ¶ 55. The Court will, however, strike ¶ 56, but provide Plaintiff the opportunity to amend ¶ 56 of its counterclaim within fourteen days of the entry of this memorandum's accompanying order.

### D. TCPA

To make out a claim under the TCPA, a plaintiff must establish: (1) an ascertainable loss of money or property; (2) that such loss resulted from an unfair or deceptive act or practice; and (3) that the act or practice is declared unlawful under the TCPA. Tenn. Code Ann. § 47-18-109. Although the TCPA imposes no single standard to determine whether an act or practice is deceptive, the Tennessee Supreme Court has described a deceptive act or practice as "'a material representation,

practice, or omission likely to mislead . . . reasonable consumers' to their detriment." *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009) (quoting *Ganzevoort v. Russell*, 949 S.W.2d 293, 299 (Tenn. 1997) (quoting *Bisson v. Ward*, 628 A.2d 1256, 1261 (Vt. 1993))).  Presumably, Plaintiff brings this action under the "catch all" provision of Tenn. Code Ann. § 47-18-104(b)(27), which declares "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person" an "unfair or deceptive act[].["9]

Defendant raises essentially the same argument it raised against Plaintiff's promissory fraud claim: it was not obligated to abide by the threshold levels and therefore committed no deceptive act.  However, again the Court must conclude the counterclaim does not state a claim regarding the face of the Contract and confidentiality agreement, but rather refers to Defendant's representations during negotiations.  This argument fails for the same reason it failed in regard to Plaintiff's promissory fraud claim.  Indeed, "[p]laintiffs who successfully press allegations of promissory fraud often have TCPA claims as well." *Shah*, 338 F.3d at 569 (holding a plaintiff successfully alleged a TCPA claim in part because "[p]laintiffs presented evidence that Defendant fraudulently represented it would not invoke the termination clauses except for poor performance") (citing Tenn. Code Ann. § 47-18-104(b)(27)); *see also Steed Realty v. Oveisi*, 823 S.W.2d 195, 201 (Tenn. Ct. App. 1991) ("Having heretofore held that Steed is liable for promissory fraud because he did not intend to carry

---

[9] Subsection (27) was amended in 2011 to circumscribe its enforcement to be solely the purview of the "attorney general and reporter and the director of the division." *See* Tenn. Code Ann. § 47–18–104(b)(27) ("Engaging in any other act or practice which is deceptive to the consumer or to any other person; provided, however, that enforcement of this subdivision (b)(27) is vested exclusively in the office of the attorney general and reporter and the director of the division."); 2011 Tenn. Pub. Acts 510, at *15; 2011 Tenn. Pub. Ch. 510; 2011 Tenn. HB 2008 (effective Oct. 1, 2011).  This amendment applies to "all liability actions for injuries, deaths and losses covered by this act which accrue on or after [October 1, 2011]," and as such is inapplicable to this case. *See Hanson v. J.C. Hobbs Co., Inc.*, No. W2011–02523–COA–R3–CV, 2012 WL 5873582, at *9 n.3 (Tenn. Ct. App. Nov. 21, 2012).

out the promises that he made when he made them, we also find that Steed 'knowingly violated the [TCPA]. . . . Steed's knowledge of what was in the contract when he presented it to the purchasers is not in dispute. He knowingly deceived the purchasers into thinking that they were getting more than was stated in the contract and he subsequently relied on the contract to escape this obligation.") (citing Tenn. Code Ann. § 47-18-104(b)(27)).

Defendant also argues the TCPA claim fails because a valid contract exists covering the same subject matter. Both of the cases cited by Defendant in support of this contention rely on a finding of no deceptive or unfair practice to hold the plaintiffs' TCPA claims failed. *NSA DBA Benefit Plan, Inc. v. Conn. Gen. Life Ins. Co.*, 968 S.W.2d 791, 797-98 (Tenn. Ct. App. 1997) ("NSA cannot maintain an action under the TCPA in the face of a valid contract *without the existence of a false misrepresentation or a deceptive act or practice*.") (emphasis added); *Brandel v. Moore Mortg.& Inv. Co.*, 774 S.W.2d 600, 607 (Tenn. Ct. App. 1989) ("[I]mplicit in the findings of the trial court is a finding that the defendant did not willfully or knowingly engage in the use of deceptive or unfair acts. . . . Since there is a contract requiring defendant to make the loan at the agreed upon interest rate, *there is no false representation existing*.") (emphasis added). Here, the Court has held Plaintiff sufficiently pleaded such a practice.

Moreover, a plaintiff may recover under both a breach of contract claim and a TCPA claim as long as the damages are distinct. *See Farris v. Standard Fire Ins. Co.*, 280 F. App'x 486, 489 (6th Cir. 2008) (holding district court erred when it required the plaintiff to choose damages for breach of contract or its TCPA claim because "a plaintiff may recover in tort and in contract so long as the damages for the two causes of action are distinct") (citing *Barrett v. Vann*, No. E2006-01283-COA-R3-CV, 2007 WL 2438025, at *18 (Tenn. Ct. App. Aug. 29, 2007) ("Thus, allowing recovery for breach of contract and a TCPA violation will not run afoul of the election of

20

remedies doctrine so long as the plaintiff is not receiving double redress for the same wrong.") (internal quotation marks omitted)); *see also Shah*, 338 F.3d at 569, 574 (holding the plaintiff's TCPA claim and breach of contract claim both raised genuine issues of fact).

Accordingly, the Court will **DENY** Defendant's motion to dismiss Count Four of the counterclaim.

## IV.     CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** and will **DENY IN PART** Defendant's motion to dismiss Plaintiff's counterclaim (Court File No. 66).

(1)     The Court will **DENY** Defendant's motion as to Count One.

(2)     The Court will **GRANT** Defendant's motion as to Count Two.

(3)     The Court will **DENY IN PART** and will **GRANT IN PART** Defendant's motion as to Count Three.  Specifically, the Court will deny Defendant's motion to dismiss the count and deny defendant's motion to strike ¶ 55.  The Court will, however, grant Defendant's motion to strike ¶ 56, but with leave for Plaintiff to amend ¶ 56 of its counterclaim within fourteen days of the entry of this memorandum's accompanying order, if such amendment is appropriate.

(4)     The Court will **DENY** Defendant's motion as to Count Four.

**An Order shall enter.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**